Complainants, Edmund S. Hersh and the Union County Trust Company, a corporation, as executors and trustees under the last will and testament of Louis F. Hersh and Edmund S. Hersh, individually, bring this bill of complaint praying for a construction of said will and a declaration of the rights of the complainants and all other parties in interest under the terms thereof.
Louis F. Hersh and his brother, Herman Hersh, conducted a wholesale grocery business in the city of Elizabeth, under the firm name of L.F. Hersh Bro. The business was conducted for a period of forty years until the death of Herman on September 12th, 1928, he predeceasing his brother. Under the last will and testament of Herman Hersh, his interest in the business and in his real estate was bequeathed and devised to his brother, Louis, and he directed that upon the death of Louis (who was named in the will as executor and trustee) the Union County Trust Company, of Elizabeth, New Jersey, was to act as executor and trustee in his place and stead.
Louis F. Hersh and Herman Hersh were indebted to Isaac Newman in the sum of $54,162.81 and to Annie Newman in the sum of $2,208.28. Mrs. Newman was the sister of Louis and Herman Hersh, and Iasac Newman now deceased was her husband. Interest had been paid on these debts by Louis and Herman Hersh during their respective lives and such payments have been continued by Dorothy H. Rosensohn, who is one of the executors and trustees under the will of Louis *Page 3 
F. Hersh. After the death of Herman, Louis F. Hersh had borrowed of Annie Newman the further sum of $15,950, upon which he paid interest in his lifetime, such payments also being continued by his executors and trustees. Under the provisions of the eighth paragraph of his will, Louis F. Hersh gave to his son, Edmund S. Hersh, in addition to other bequests,
"the wholesale grocery business now conducted by me in the City of Elizabeth, New Jersey, under the name and style of L.F. Hersh Bro., including all merchandise, accounts due from customers as per ledger, automobiles, transportation equipment and all personal property pertaining to the business, together with the sum of twenty-five thousand ($25,000.00) dollars in cash to be paid to him by my Executors and Trustees out of the first available funds; subject, however, to all bills payable and to any indebtedness due from said L.F. Hersh Bro. on account of said grocery business."
In the answer and counter-claim of Dorothy H. Rosensohn, daughter of Louis, and also a legatee under his will, it is maintained that the respective sums of money due to Isaac and Annie Newman and the interest paid thereon by the trustees and also the unpaid balance of a $50,000 legacy given to Annie Newman by the eighteenth clause of the will of Herman Hersh should be held to be an indebtedness of the grocery business and therefore should be paid by and charged against that portion of the estate which was devised to Edmund Hersh under the eighth paragraph quoted above. It is also urged in the answer and counter-claim that the executor and trustee be charged with the duty of securing from Edmund S. Hersh repayment of any moneys which were paid out of the general estate of Louis Hersh on account of said obligations and that Edmund S. Hersh make such repayment and exonerate the general estate therefrom.
This answer and counter-claim was by order of the court later amended and in its amended form prays that the sum of $40,000 representing moneys borrowed by Louis F. Hersh during the months of September and October, 1933, and unpaid at the time of his death, be decreed to be an indebtedness of L.F. Hersh Bro. on account of the grocery business; and that moneys and checks in the safe amounting to *Page 4 
$14,371.27, the result of collections made immediately prior to the death of Louis, which were taken over by Edmund as part of the grocery business, be decreed to belong to the general estate.
It does not appear that any partnership agreement in writing between Louis F. Hersh and Herman Hersh was entered into but it is not in dispute that the brothers were co-partners in the wholesale grocery business since about the year 1888. It is likewise common ground that Louis F. Hersh owned sixty per cent. and Herman Hersh forty per cent. of the co-partnership business and that neither of them during the course of his business career owned in his individual name any property, real or personal. Everything the brothers possessed was carried in the co-partnership name of L.F. Hersh Bro. and the needs of each as they arose from time to time were cared for and paid out of funds drawn on the co-partnership account. Neither of the brothers possessed individual bank accounts or enjoyed a fixed income from the business. L.F. Hersh Bro. was a magnificent example of "behold, how good and pleasant it is for brethren to dwell together in unity."
Requests for instructions one to three, inclusive, seek a ruling as to whether the debts due to the estate of Isaac Newman and to Annie Newman and the balance of unpaid legacies provided for in the will of Herman Hersh are to be treated as "bills payable" within paragraph 8, supra, and therefore are to be charged against the bequest to Edmund S. Hersh, or whether they are to be paid out of the general estate under the provisions of paragraph 1 of the will which reads as follows:
"I order and direct that all my just debts and funeral expenses, including any indebtedness due from me to my sister, Annie Newman, and my brother-in-law Isaac Newman, be paid as soon as possible after my decease."
It does not appear that the Hersh brothers at any time required or needed the money given by the Newmans and the acceptance by Louis and Herman Hersh of the money advanced by Mr. and Mrs. Newman was undoubtedly prompted by a desire to assist them in the investment of their capital. *Page 5 
On July 1st, 1907, Louis F. Hersh and Herman Hersh, as L.F. Hersh Bro., entered into a co-partnership agreement with Isaac Newman for the conduct of a wholesale grocery business in the city of Plainfield under the name of L.F. Hersh Bro. By the terms of that agreement Isaac Newman had a forty per cent. and L.F. Hersh Bro. a sixty per cent. interest in the business. The agreement expressly limited the operation of the co-partnership to the city of Plainfield and provided that the real estate owned and business conducted by L.F. Hersh Bro. outside of the city of Plainfield was not to be construed as forming any part of the partnership property under the agreement.
Isaac Newman contributed to the capital of this partnership the sum of $10,000 and L.F. Hersh Bro. of Elizabeth contributed upwards of $20,000. The $10,000 contributed by Newman was a part of the sum of $26,310.15 to his credit on the books of L.F. Hersh Bro. as of January 1st, 1907, the balance of this $26,310.15 being carried there as a general liability.
By mutual agreement in 1910 Newman's interest in the Plainfield business was terminated and thereafter the business was conducted by Louis and Herman Hersh as their individual enterprise under the same firm name as theretofore until some time in the year 1932.
In 1912 there was organized a wholesale grocery business to be conducted in the city of Newark, and although no written agreement of co-partnership appears, the book records show that Isaac Newman was credited with an investment in the Newark business to the extent of $42,000, and that a balance of $12,162.81 remained as an investment in the form of a credit on the books and drew interest at five per cent. Although in 1912 Newman was credited with an investment of $42,000 in the Newark business, the co-partnership of L.F. Hersh Bro. continued to carry him as a general creditor for the full amount of their indebtedness to him, as is indicated by entries in their books of account.
In 1925, when Newman and both Hersh brothers were still alive, the Newark business was terminated and the merchandise, bills receivable and other assets were taken over by the *Page 6 
Elizabeth business. Newman was given a promissory note of L.F. Hersh Bro. for $54,162.81. Evidently there were no profits made in the Newark business and Newman did not participate in losses, if any there were. In a book account, in Herman's handwriting, appears a list of assets and liabilities down to January 1st, 1928, in which the $54,162.81 was included. Newman held the note until his death and it is now a part of his estate. During the joint lives of Herman and Louis Hersh, L.F. Hersh Bro. paid interest to Newman at the rate of six per cent. on the amount of the note, and as has been pointed out above, after Herman's death interest payments were continued by Louis until his death, since which time the executors and trustees of his estate (Dorothy Hersh Rosensohn being one of them) have also paid the interest due.
After the death of Herman Hersh, his sole executor, Louis, made an affidavit for the use of the Inheritance Tax Bureau of this state in order to fix the tax liability of the estate. Under the caption "Liabilities" in "Schedule D" appears the following: "Liabilities of the grocery business of L.F. Hersh Bro. Sept. 12th, 1928. * * * I. Newman * * * $54,162.81 * * * Mrs. I. Newman $2,208.28." Other items listed made a grand total of $170,899.92, and the share of Herman Hersh of forty per cent. was determined at $68,359.96. After the filing of the return the Inheritance Tax Bureau made inquiry by letter concerning the Isaac Newman claim, and in response thereto a further affidavit was made by Louis F. Hersh sometime in October, 1929, in which among other things he said: "After the said branch had been conducted in the city of Newark for a number of years it appeared to be advisable to discontinue said branch, and said Isaac Newman instead of requiring the amount of the capital contributed by him in the conduct of said branch business to be returned to him, allowed and permitted the amount of his contribution to remain in the business of L.F. Hersh Brother, upon an agreement between the firm of L.F. Hersh Brother and the said Isaac Newman that the said amount should be considered and be an indebtedness of thesaid business, and that the said firm of L.F. Hersh *Page 7 Brother would pay the said Isaac Newman interest on the amountof said indebtedness, and the whole or any part of it at any timeupon demand." (Italics mine.)
All of the foregoing points to the fact that during the lives of the Hersh brothers the debts due to the Newmans were treated as obligations of L.F. Hersh Bro., but I find other language in the will to be dispositive of the questions raised. The first paragraph thereof provides as follows:
"I order and direct that all my just debts and funeral expenses, including any indebtedness due from me to my sister, Annie Newman, and my brother-in-law Isaac Newman, be paid as soon as possible after my decease." (Italics mine.)
Words are mere symbols and it is necessary to compare them with things, persons and events in arriving at what the testator meant when he used in this paragraph the words "my just debts" and "including any indebtedness due from me to my sister, Annie Newman, and my brother-in-law Isaac Newman."
When Louis F. Hersh made his will on May 5th, 1932, he was the sole and absolute owner of everything which he or his brother previously possessed. That ownership arose by virtue of the will of Herman, under which Louis was the residuary legatee, as well as the named beneficiary of any right, title or interest which Herman had in property of any kind standing in the name of Louis F. Hersh or Louis F. Hersh Bro. In that posture Louis possessed the unquestioned right, if indeed the Newman obligation had been previously treated as a business debt by the brothers, to remove those obligations from that category and to direct that payment be made by his executors and trustees out of the general estate. When the deceased used the words "due from me" in the first paragraph of his will, he unquestionably referred to the debt of $54,162.18 due to Isaac Newman and the sums of $2,202.28 and $15,950 due to his sister, Annie Newman. The words "* * *including any indebtedness due from me to my sister, Annie Newman and my brother-in-law Isaac Newman" are all inclusive. (Italics mine.) As a matter of fact there was no other debt due to the Newmans except *Page 8 
those mentioned above. What he undoubtedly intended by the first paragraph of his will was that the Newman indebtedness was to be treated by his executors and trustees as an estate liability, as distinguished from "any indebtedness due from said L.F. Hersh 
Bro. on account of said grocery business," which is the language used in the eighth paragraph.
The deceased was a successful business man and had amassed a large fortune. He knew what his grocery business could stand by way of liabilities. He recognized that capital was required for he not only provided that his son have the business and all the accounts due from customers as well as the equipment and all personal property belonging to the business, but he also gave him in the same paragraph $25,000 in cash to be paid him "out of the first available funds." He desired his business to be carried on and certainly no one knew its condition better than he. I also have in mind that the evidence discloses that the business had for three years prior to the date of the testator's will sustained heavy losses, and I cannot but conclude that he realized that to add the Newman debts to the burden the business was then carrying, would mean to give the business to his son with one hand and deliberately destroy it with the other. In construing the testator's will in order to arrive at his intention when he executed it, and by ascribing to him, so far as his language permits, the common impulses of human nature (Murphy v. Murphy, 118 N.J. Eq. 108; 177 Atl. Rep. 682;affirmed, 119 N.J. Eq. 83; 180 Atl. Rep. 829), I can come to no other conclusion.
The trustees are instructed that the "Newman" debts are to be paid out of the general estate.
We turn, next, to so much of the requests for instructions as deals with the legacies. Herman Hersh, in the eighteenth paragraph of his will, provided:
"I give and bequeath to my sister, Annie Hersh Newman the sum of fifty thousand ($50,000.00) dollars which sum, however, is to remain in the co-partnership business of L.F. Hersh Bro. for so long a period as my estate is interested therein, or said co-partnership desires to retain the same, provided that said L.F. Hersh Bro. shall pay to my said sister, interest thereon at the rate of five per *Page 9 
cent. per annum, semi-annually; and provided also that my said sister shall be privileged to withdraw from said principal sum at the rate of not more than three thousand ($3,000.00) dollars per year, upon giving sixty days' notice, the sums withdrawn to be deducted from the principal fund. Upon the decease of my said sister, any remainder of said bequest is to revert to and become a part of my residuary estate."
The will also provided for various other legacies, on account of which some payments have been made. By her counter-claim, Dorothy Rosensohn prays that the unpaid amounts of such legacies be decreed a charge against the forty per cent. interest of her deceased uncle Herman in the grocery business bequeathed to her brother Edmund under the eighth paragraph of her father's will.
The $50,000 legacy bequeathed to Annie Hersh Newman was to be and remain "in the co-partnership business of L.F. Hersh Bro.for so long a period as my estate is interested therein, or saidco-partnership desires to retain the same * * *." (Italics mine.) The co-partnership business of L.F. Hersh Bro. was not limited to the wholesale grocery business alone. It consisted of other enterprises such as Hersh Motor Car, c. By the terms of the will of Herman Hersh, the legacy in question is not irrevocably attached to the co-partnership business but only "for so long a period as my estate is interested therein," or, putting it in the alternative, as the testator does, and using his language, "or said co-partnership desires to retain the same * * *." As to this legacy, I conclude that it was optional with Louis F. Hersh to allow the interest of Herman Hersh to remain as theretofore or to terminate it if he thought desirable, for again in the second paragraph of the will of Herman Hersh it is provided:
"I order and direct my executor and trustee hereinafter named to keep my estate invested in and to continue the co-partnership of L.F. Hersh Bro., of which I own forty (40%) per cent. and of which my brother Louis F. Hersh owns sixty (60%) per cent., for the joint benefit of my said brother Louis F. Hersh and of my estate for so long a period as shall be agreeable to my saidbrother." (Italics mine.)
The evidence shows that after the death of Herman, Louis proceeded to and did appropriate to himself the interest of *Page 10 
Herman Hersh and assume the payment of his brother's debts and legacies. As evidence of this, the various exhibits are convincing. These exhibits show that he declared assets totaling the sum of $3,683,823.02 as belonging to himself. This sum represents the value of the total assets of L.F. Hersh Bro. Under "liabilities" he shows his assumption of the legacies of Herman Hersh amounting to the sum of $186,000, less $30,000 that he had paid on account, leaving a balance due on account of legacies (including the Annie Newman legacy), of $156,000. He then shows his net assets to be $3,414,814.17, and at the foot of the financial statement is this notation: "The balance of the Herman Hersh Estate reverts to Louis F. Hersh, his brother, who is the surviving partner." (Italics mine.) These statements he made year after year in the same form up to the time of his death. They were intended by him to show his financial worth and standing and upon them he assumed to do and actually did business with others. The state and federal inheritance taxes were not paid out of money provided by disposing of any property that belonged exclusively to Herman Hersh. If further evidence tending to establish the fact that Louis F. Hersh appropriated the entire estate of Herman Hersh to his own use and benefit were needed, it is found in the language which he used in devising the grocery business to his son Edmund when he said "* * * the wholesale grocery business now conducted by me * * * under the name and style of L.F. Hersh Bro. * * *." (Italics mine.) The legacies therefore under the will of Herman Hersh are not "bills payable" or an "indebtedness due from said L.F. Hersh Bro." on account of the grocery business. They are chargeable against the general estate.
We turn, next, to the cash and checks amounting to $14,371.27 in the safe, the ownership of which is questioned by the amended counter-claim. Upon the day of Louis F. Hersh's death, there were in the safe cash and checks which salesmen and others had collected shortly prior to and upon the day of his death. These Dorothy Hersh Rosensohn, in her amended counter-claim, alleges are a part of the general *Page 11 
estate and not a part of the grocery business devised to her brother Edmund.
The testimony shows that it was the custom of decedent to keep in the safe from time to time cash which represented collections from salesmen identified with the grocery business. Such moneys were used in connection with the grocery business and its current requirements. On December 1st, 1933, the day upon which the testator died, it appears from the cash book that cash and checks on hand amounted to the sum of $14,371.27. This sum was claimed by Edmund Hersh as part of the assets of the grocery business. It was so considered by the executors, including Dorothy Hersh Rosensohn, for after the death of her father the executors actually gave the cash and checks to Edmund S. Hersh. The words in the eighth paragraph of the decedent's will in which is bequeathed the grocery business to the son Edmund, to wit, "and all personal property pertaining to the business" not only include "all merchandise, accounts due from customers as per ledger, automobiles, transportation equipment," but include all other personal property, subject only to the qualification that it shall pertain to the business. (Italics mine.) The words "all personal property" are unlimited by the preceding words, and are comprehensive enough to include every kind of personal property pertaining to the business. The doctrine of ejusdemgeneris contended for is not applicable to the language here used by the testator. If, as here, the particular words exhaust the genus, there is nothing ejusdem generis left, and in such case we must give the general words a meaning outside of the class indicated by the particular words, or we must say that they are meaningless, and thereby sacrifice the general to preserve the particular words. In that case the rule would defeat its own purpose. United States v. Mescall, 215 U.S. 26;30 Sup. Ct. 19; 54 L.Ed. 77. The checks and cash mentioned were personal property pertaining to the business and passed to Edmund under the eighth clause of his father's will.
On September 25th, 1933, Louis F. Hersh borrowed from the Union County Trust Company $20,000 and on October 25th, 1933, he borrowed an additional $20,000. As hereinabove *Page 12 
set forth, Dorothy Hersh Rosensohn, by her amended counter-claim, prays that the court determine whether the money so borrowed and deposited in the bank account to the credit of L.F. Hersh Bro. was used in whole or in part for the payment of obligations of the grocery business and whether such indebtedness is not chargeable against the grocery business bequeathed to her brother.
Harry Schimkowitz, a witness produced on behalf of Dorothy Hersh Rosensohn, testified substantially that the necessity for borrowing this $40,000 arose because of the condition of the grocery business, and that the proceeds thereof were deposited in the general account of L.F. Hersh Bro. and used to pay obligations of that business. The examination made by this witness, however, was inadequate, as appears from his own testimony and admissions.
According to the testimony of Milton M. Bronson, an accountant produced by complainants, who examined the books of account from January 1st, 1932, to the date of the death of decedent, December 1st, 1933, the two promissory notes are properly chargeable to the general estate and I so find from all of the testimony.
The fourth request for instructions seeks a ruling as to whether deeds, real property and chattel mortgages and notes taken by the testator in payment of or as security for debts due to him in the operation of the grocery business are to be considered as part of the accounts due from customers, as per ledger, or whether they shall be considered as investments of the testator separate and independent of the assets of the grocery business.
The evidence discloses that various customers of L.F. Hersh 
Bro. who were either indebted to or had borrowed money from L.F. Hersh Bro. in order to remain in business, gave as security for such debt or loan, as the case may be, either a chattel mortgage or a mortgage covering real estate. The evidence satisfies me that while the character of the indebtedness in these instances was changed by the acceptance of securities, the substance of these accounts remained the same, namely, "accounts due from customers as per ledger" and they were "personal propertypertaining to the *Page 13 
[grocery] business" and under the eighth paragraph of decedent's will these securities passed to Edmund Hersh. (Italics mine.)
The requests for instructions numbered V, VI, VII, VIII, IX, X and which relate to the provisions contained in the will of Louis F. Hersh relating to the Hersh Motor Car Company (a trade name under which L.F. Hersh Bro. conducted the business of selling motor cars) remain unanswered since during the hearing the complainants and the parties in interest arrived at a settlement of the matters there involved.
Under requests for instructions numbered XI and XII, the complainants seek a ruling as to whether they can accelerate the distribution of the estate by an agreement entered into by the parties in interest.
The bill of complaint alleges that certain of the beneficiaries named in the will claim that the condition of the estate makes it advisable that distribution prior to the time provided for in the will of the decedent should be made, and alleges that the trustees deny that such settlement or distribution can be made prior to the expiration of three years after the death of Bertha Hersh, the decedent's widow.
Whether this court can decree acceleration of the trusts created in the will of the decedent and direct immediate distribution of the principal between the parties entitled thereto raises a purely academic question in the present proceedings. The answer to the question will depend on the procedure adopted to terminate the life estate and the intention indicated by the will.
Cf. Bennett v. Fidelity Union Trust Co., 123 N.J. Eq. 198;196 Atl. Rep. 375. This matter can be disposed of only upon a plenary bill brought in this court for that purpose.
Requests for instructions XIII to XXIV, inclusive, deal with the employment by the trustees of James Rosensohn as superintendent of the properties. Under the fourteenth paragraph of the will the trustees named therein are given authority
"(a) To exercise general control and management of and supervision over all my real estate and to pay all taxes, assessments and necessary charges and expenses for the proper upkeep of the same; *Page 14 
to collect and receive the rents, issues and profits thereof, and to let the same in such manner as they shall think proper, and from time to time renew leases."
After the quoted paragraph the following appears:
"Note: — It is my will and desire that my Trustees shall employ my son-in-law, James Rosensohn, as Superintendent of my said real estate, including Hersh Towers, and as agent for the collection of all rents, for so long a period as he shall perform his duties to their satisfaction, and that he shall be paid the sum of eighty ($80.00) dollars per week for his services."
The trustees seek advice as to the nature and character of the employment of Rosensohn and the particulars and duties incident thereto. It is asked whether his employment is mandatory and exclusive; whether he may receive commissions from the estate as real estate broker or if leases or sales of estate property are made by other brokers, whether such commissions as may become due are to be paid by the estate or by Rosensohn; and further whether his services as superintendent and agent include all services connected with such real estate; or if his services in making repairs, c., negotiating and securing various mortgages and policies of insurance, dispossessing tenants and making sales of real estate, are not included in such appointment? Does his employment include authority to negotiate policies of insurance and to issue such insurance in companies for which he or a corporation organized and controlled by him acts as agent or broker? Can the trustees effect insurance independently of Rosensohn, and if they differ as to the placing and particulars of insurance, how shall it be effected and paid for so that the estate will be protected? The trustees also seek the advice of the court as to whether Rosensohn is entitled to occupy the office in the Hersh Tower Building, which is his headquarters, as superintendent or agent to conduct a general real estate and insurance business, or what rent is to be charged against Rosensohn for present and future occupancy of said office?
James Rosensohn's rights, if any, arise by reason of the "Note" following paragraph (a) in the fourteenth paragraph hereinabove set forth. The answers to the questions propounded *Page 15 
depend upon a construction of the language of the testator in that paragraph. In such a construction, the language quoted above must be read in connection with the remainder of the fourteenth paragraph, and the complete and extensive authority there given to the testator's executors. It is unnecessary to quote the remaining provisions of the paragraph. They give to the executors full, complete and broad extensive power to exercise general control and management of and supervision over all the decedent's real estate; to invest the assets of the estate or proceeds of any sale in first mortgages, and they are charged "to do everything and all things that they deem best in the interest of and for the conservation, protection and betterment of my estate as fully and completely as I might do personally were I alive and able to act for myself." Various other powers relating to the assets of the estate are given to the executors by this paragraph.
By the fifteenth paragraph of his will, the decedent authorized his executors to sell any of his real estate whenever in the judgment of the majority of them it became necessary or desirable for the benefit of his estate to do so.
Considering all of the provisions of the fourteenth paragraph of the will, I conclude that the employment of Rosensohn is not mandatory nor exclusive, and that it can be terminated by action of the majority of the executors. Rosensohn, according to the testimony, acted as superintendent of the real estate during the lifetime of the decedent. The desire to have him continued as such expressed in the "Note" is not mandatory nor exclusive. There are other provisions of the will which are inconsistent with any such interpretation. The power vested in the executors to exercise general control, management and supervision over the real estate would become ineffective if the executors were limited to dealing only with Rosensohn. So, too, the direction to the executors to collect and receive the rents and to let real estate in such manner as they shall think proper and from time to time renew leases forbids such a narrow construction; so also does the power of sale which if exercised as to all real estate would certainly deprive Rosensohn of his employment. Reading testator's will as a whole with respect to the "Note" and *Page 16 
Rosensohn's rights thereunder, I conclude that his employment during the lifetime of the deceased at a salary of $80 per week was recommended by the deceased to be continued by his executors and if they see fit they may by a majority of the trustees terminate such employment in the exercise of the broad powers granted to them in the general management of the estate. The recommendation is not mandatory nor exclusive.
Under the decedent's will I do not find that it was contemplated or intended that Rosensohn if retained as agent for the collection of rents by the executors and as superintendent of real estate could negotiate or effect leases or sales of real estate, or that he would be entitled as a real estate broker to commissions in addition to the weekly compensation specifically provided. Of course, in such instances as he is authorized by the executors to negotiate for such leases and to effect such sales of real estate he may be entitled to commission. Such commissions if earned by Rosensohn are payable out of the assets of the estate. I interpret testator's will with respect to the instructions here requested not only from a reading thereof but from the testimony offered in aid of the interpretation and the facts and circumstances surrounding Rosensohn's employment by the decedent during his lifetime.
Rosensohn's employment as superintendent, however, does not vest in him authority to make repairs, alterations or improvements, or to negotiate fire and other insurance, leases, mortgages or the sale of real estate without the direction and concurrence of the trustees. Such power is vested in the executors alone and it is their right and duty to transact such matters.
Rosensohn in this suit (one merely for construction of the will of the deceased and for instructions to the trustees) counter-claims for commissions for effecting leases and rentals generally, and prays the court to decree whether an agreement dated February 21st, 1934, made with the trustees is in force or whether it has been terminated, and if the agreement has not been terminated to fix by decree the amount of commission to which he is entitled. *Page 17 
It is not an inflexible rule that, when the court of chancery, having once acquired jurisdiction for one purpose, it is bound to retain the case for complete relief; whether the court of chancery will do so, so as to include all the points in controversy between the parties, rests somewhat in the discretion of the chancellor. Shaw v. G.B. Beaumont Co., 88 N.J. Eq. 333;102 Atl. Rep. 151; Caruso v. Caruso, 101 N.J. Eq. 350;139 Atl. Rep. 812.
The counter-claim presents a purely legal question for which there is an adequate remedy at law. The mere fact that a court of equity has acquired jurisdiction for one purpose, does not empower the court to retain the case for complete relief. MercerCounty Traction Co. v. United New Jersey Railroad and CanalCo., 65 N.J. Eq. 574; 56 Atl. Rep. 897. The principle that equity will not entertain jurisdiction where there is an adequate remedy at law is so well established that it needs no citation of cases to support it. And the fact that objection has not been made on any pleading or motion directed to the counter-claim, cannot confer jurisdiction since such jurisdiction cannot be acquired by consent or acquiescence of the parties. Long Branch
v. Hoch, 99 N.J. Eq. 103; 138 Atl. Rep. 106.
Incidental to the foregoing the question is presented for instructions by the court as to whether Rosensohn is chargeable with the rental value of the offices he occupies in the building known as "Hersh Towers."
Rosensohn is chargeable with rent to the extent that the rental value of the space he occupies is in excess of the rental value of an office necessarily required for his accommodation as superintendent of the real estate and agent for the collection of rents. While there is nothing in the will of the deceased which provides for office space for Rosensohn, the prevailing practice in connection with the management of office buildings of the character of the "Hersh Towers" and the fact that an office was provided for him during the lifetime of the deceased, prompts the court in arriving at this conclusion.
The final question presented is whether Edmund S. Hersh *Page 18 
is entitled to receive the rent of the stores in the buildings 1179-81 East Grand street, Elizabeth, New Jersey.
The testator in the eighth paragraph of his will directed that his business shall be permitted to continue
"* * * in the occupation of the several buildings where now conducted until the final distribution of my estate, and for so long a time as occupied said business shall pay for the use of the same as rental two-thirds of the annual taxes assessed against the Hersh Building, No. 207 Broad Street, Elizabeth, New Jersey, the annual taxes assessed against the buildings in the rear of said Hersh Building, now occupied by the business, the annual taxes assessed against the warehouse on East Grand Street, Elizabeth, New Jersey, and the annual taxes assessed against the garage property on West Grand Street, Elizabeth, New Jersey." (Italics mine.)
I do not agree with the argument that the obligation imposed upon Edmund to pay taxes on the entire East Grand street buildings carries with it the right to the possession of the entire buildings. The right of possession is fixed by the will, namely, "that said buildings shall be permitted to continue in the occupation of the several buildings where now conducted." The payment of taxes is imposed as rental. What the testator meant seems clear to me from the language he used. What he intended was that the grocery business was to pay all the taxes on the buildings and continue "in the occupation of the several buildings where now conducted until the final distribution of my estate," and for that occupation and use he provided the payment of taxes as rent. The stores in question, according to the evidence, were never occupied by the wholesale grocery business. The rent derived from the stores, if any, belongs to the estate.
The court in construing a will must search for the testator's intention in the light of the facts as presented and the circumstances surrounding the testator at the time of the making of his will, the court placing itself, as nearly as it can, in the testator's position, so as to get his point of view as nearly as possible. Howell v. Steelman, 76 N.J. Eq. 423;74 Atl. Rep. 976; affirmed, 77 N.J. Eq. 586; 78 Atl. Rep. 258.
I will advise decree in accordance with the foregoing conclusions. *Page 19